IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2017

## STATE OF TENNESSEE v. JAMES W. BURTON

**Appeal from the Criminal Court for Fentress County**
**No. 2015-CR-146    E. Shayne Sexton, Judge**

_____

### No. M2016-01190-CCA-R3-CD

_____

A Fentress County jury convicted the Defendant of perjury, and the trial court sentenced him to serve eleven months and twenty-nine days on supervised probation.  On appeal, the Defendant asserts that the evidence is insufficient to support the jury's verdict against the Defendant for perjury.  After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Thomas Harding Potter, Jamestown, Tennessee, for the appellant, James W. Burton.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Jared R. Effler, District Attorney General; and David Pollard and Tessa Lunceford, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from testimony given at an order of protection hearing.  The Defendant filed an order of protection against Faye Barna.  Based upon the Defendant's testimony at the hearing, a Fentress County grand jury indicted the Defendant for aggravated perjury.

### A. Order of Protection Hearing

As relevant to this appeal, we include the Defendant's testimony from the October 28, 2015 order of protection hearing.

> I don't know if you're aware of my case, but I've just spent the last year and a half in jail for false statements that Ms. Barna and her friends have made.
>
> I have a -- on October 1st, approximately 7:40 a.m., Ms. Barna drove by my place of work, gave me the finger twice, and -- and gave me the sign of a gun as though – as if she was shooting at me.
>
> Now, I have -- on other occasions, I have here bills from Jamestown hospital on some broken ribs that she had assaulted me in the past.
>
> I, also, have a list. I -- I pleaded to a -- a violation of an Order of Protection, because I was not allowed to turn my guns in. And the reason I didn't get to turn my guns in was because Ms. Barna had hidden them. I have a list that she gave -- that she gave the sheriff.

The Defendant began listing multiple weapons that were "missing." When asked how this was relevant to the basis of the order of protection and his fear of Ms. Barna, he responded:

> [I] was saying I was in fear of my life. I hate to admit it. We used to shoot a lot together, and she's probably a better shot than I am. I have three pistols that are missing.
>
> . . . .
>
> So having my -- my guns, and not being turned in, yes, I am in fear for my life. The fact that she has threatened me physically and -- and has posted posts on the Internet taunting me, I feel as though that I would be justified in -- in getting an Order of Protection.
>
> And I could call Ms. Parker as a witness to verify this -- this action and the things that she's done.

The Defendant then began talking about his frustration that he had been unable to retrieve his belongings from Ms. Barna's property. Ms. Barna's attorney objected to the

relevance of the testimony, and the Defendant conceded that his testimony regarding the retrieval of his belongings had nothing to do with his alleged fear of Ms. Barna. He continued:

> Okay. Well, I do have a fear. I have been abused many times during the course of the relationship, and she's even thrown a kitchen knife at me. The fact that she has pointed this gun figure at me and -- and the fact that I know she still has some of my guns, I do have fear.

On cross-examination, the Defendant agreed that the only incident causing his fear was Ms. Barna driving past him and giving him "the middle finger and the sign of a gun." The Defendant confirmed that this event occurred on October 1, 2015, at approximately 7:40 a.m. He stated that he filed his petition for an order of protection the next day. He reiterated that he signed his petition the day after Ms. Barna drove past him in the light blue Lexus SUV and made the threatening gestures. He agreed that this was the only encounter he had with Ms. Barna during that time period. He further agreed that Ms. Barna's Facebook post did not contain any threats although he noted that Ms. Barna was "antagonizing" in her posts.

Two other witnesses testified at the hearing: Claudia Baker and Faye Barna. Ms. Baker testified that she was at the Hitching Post Store on October 1, 2015, at approximately 7:40 a.m. Ms. Baker recalled that she was walking out the front door of the store when she observed a light blue SUV "slow down as it was going past the store." She noticed "the person . . . making some signals with their hands." Once out of the door, she noticed the Defendant was on her left, and she asked "Who was that?" He replied "That was Fay." On cross-examination, Ms. Baker stated that she was unsure of the date; however, the store opened at 7:30 a.m. and she was opening the store so she believed the time to be between 7:30 and 7:45 a.m. Ms. Baker did not know the identity of the person in the car but recalled that the Defendant went to the courthouse that morning to file for an order of protection.

Ms. Barna testified that she did not drive by the Hitching Post Store on October 1, 2015, and make threatening gestures toward the Defendant. Ms. Barna explained that she flew out of Nashville to Michigan on September 28, 2015. Ms. Barna presented her flight itinerary and boarding pass. She stated that she returned to Nashville on October 17, 2015. She provided an October 17, 2015 receipt for a rental car she rented in Traverse City, Michigan to drive back to her daughter's house in Nashville, Tennessee. Ms. Barna also presented multiple receipts from purchases she made throughout her stay in Michigan. Ms. Barna testified that on October 1, 2015, at approximately 7:30 a.m., she was at a Medicare Walk-in Clinic in Gaylord, Michigan due to some issues with her hip. She provided medical records to document her treatment. At this point, the

Defendant interjected, altering the date of the incident to September 23, 2015. Ms. Barna provided a receipt for dinner at a "Japanese steak place" in Nashville on September 23, 2015. Ms. Barna explained that she left her home on the morning of September 23, 2015, and drove to Nashville to stay with her daughter until her flight to Michigan.

### B. Trial on the Aggravated Perjury Charge

At the May 26, 2016 trial, the parties presented the following evidence: Faye Barna testified that she owned a "guest ranch/bed and breakfast next to the Big South Fork" and that the Defendant rented a bunkhouse from her. Ms. Barna stated that the Defendant rented the bunkhouse for two or three months before moving into her house. She confirmed that she and the Defendant began a "romantic relationship." The Defendant did not like Ms. Barna's son, who lived in the barn and helped her with work around the ranch. Ms. Barna stated, "[the Defendant] hated my son so my son left" and the Defendant began helping Ms. Barna around the ranch in the wake of her son's departure.

Ms. Barna testified that her relationship with the Defendant lasted for "a little over two years." She described the relationship as one based upon deception. She said the Defendant inserted himself into situations and then claimed that she "owed" him. She referenced an incident when the Defendant "put some fish in [her] lake" without being asked and then claimed that Ms. Barna "owed" him. She said that the Defendant kept urging a "permanent connection" with her and "it never felt right," so she spent most of the relationship "trying to get rid of him." Ms. Barna said that the Defendant's assertions that she "owed" him turned into threats. "[T]he straw that broke the camel's back," Ms. Barna said, was when the Defendant threatened to break her ribs if she did not "give [him] some of [her] property."

Ms. Barna testified that after the Defendant threatened her, tried to break into her home, assaulted her, and stalked her, she called the police to seek assistance in removing him from her property. She also obtained an order of protection. She later returned to court to seek an extension of the order of protection. The trial court issued a five-year protection order. These orders of protection were entered into evidence as exhibits.

Ms. Barna testified that the Defendant was incarcerated for approximately a year and a half. When he was released, she was "scared for [her] life." She knew him to be vengeful and believed he would blame her for his incarceration. Due to this fear, she left her house. She explained that the Defendant was released on September 22, 2015 and that on September 23, she posted on Facebook about his release. She read the post aloud at trial as follows:

- 4 -

Warning, warning, warning, warning, we want all family, friends and neighbors to be aware and on the lookout for [the Defendant], he's five, eleven, 150 pounds, white man with balding white hair, blue eyes, white mustache and dark eyebrows. Jim Burton is a 59-year old man who is very dangerous. I can't express this enough. He's very dangerous and evil. He drives a white Chevy Cobalt with a broke driver's door handle and a late model Chevy Suburban, gray and - - gray and white, faded. There is an active order of protection against him, so if you see him anywhere on [the street where Ms. Barna lives] please, please call 911.

Ms. Barna testified that she left her home on September 23, 2015, because of her fear of the Defendant. She said that she stayed with her son and then the following day she went to Nashville, Tennessee. Ms. Barna produced her credit card bill documenting her expenditures on those dates in Nashville. Ms. Barna described her route as she left town, saying she drove from her house to Monterrey, bought gas at the Expressway, and then drove straight to Nashville. Ms. Barna denied driving by the Hitching Post. Ms. Barna said that she stayed in Nashville until the following week when she flew to Michigan to stay with a friend.

While in Michigan, she became aware that the Defendant had filed a petition seeking an order of protection against her. Ms. Barna identified the petition for an order of protection filed against her and read aloud the allegations against her. The petition asserted that Ms. Barna had posted warnings and "cyber-slander" on Facebook on September 23, 2015. It also asserted that Ms. Barna had assaulted the Defendant and broken his ribs and that she had driven by his work at 7:40 a.m. on October 1, 2015. Ms. Barna admitted that she had posted the previously testified to warning on Facebook, but that she had not driven by the Hitching Post and made threatening gestures toward the Defendant. She stated that the Defendant's petition was dismissed after a hearing. The receipts and documentation presented at the order of protection hearing were submitted as evidence.

Ms. Barna testified that she had been to court on five occasions since the Defendant had been released from jail over civil complaints filed by the Defendant, alleging that Ms. Barna owed him money and had retained some of his belongings. She noted that all his claims had been dismissed.

Ms. Barna testified that at the time of the alleged incident at the Hitching Post Store, she did not own or drive a light blue SUV. The vehicle had been traded in as of April 29, 2015, while the Defendant was incarcerated. Ms. Barna stated that her new vehicle was a "not new" purple Lexus sedan. Ms. Barna identified the paperwork documenting the trade-in of her vehicle.

Ms. Barna testified that the order of protection paperwork was left at her residence on October 3, 2015, and it was thereafter that she altered her return to Nashville to stay longer in Michigan.

The Defendant testified that he moved to Fentress County from Virginia to take up horseback riding. The Defendant's real estate agent recommended that he stay at Ms. Barna's ranch while deciding if he wanted to move to Fentress County permanently. The Defendant said that on his second day at the ranch, he and Ms. Barna rode horses "and [they] fell in love and [he] was at her residence ever since for three and a half years." He cited "money" as the cause of their break-up and testified about the demise of their relationship as follows:

> I invested $140,000 into repairs of her property and I got - - I lost over $100,000 in tractors and equipment and personal items. Ms. Barna promised to pay me $50,000 to leave the residence and $50,000 in six months. I was going to take my cows which she got $34,000 for. When she eventually wouldn't pay me, I told her I was going to put a lien on her property and she got very violent and she beat me unmercifully for a long period of time.

The Defendant acknowledged that he was six feet tall and Ms. Barna was five feet five inches but stated that he had taken karate for twenty-three years and "never taken a beating like that in [his] life." It was during this incident that his ribs were broken. About this incident he testified:

> That particular night I went to the bunkhouse and then the next morning I went to - - I knew - - I knew my ribs had been broken. I couldn't breathe, I was very uncomfortable and when I went to shower the next morning, I saw two of my ribs sticking out. So, I thought I'd go to Jamestown maybe have my ribs taped up. And as I went to the hospital, the - - the sheriff's deputies came and they took a report. They wanted to arrest her and I asked them not to arrest her, that I wasn't looking for any kind of trouble. I didn't know that this was a procedure. So, her son-in-law is an Oneida cop and he told her to go to the Courthouse, whoever gets to the Courthouse first, wins. So, not knowing as I return back to the ranch and four deputies took me out of there at gunpoint.

The Defendant testified that he was incarcerated for a year and a half, and on September 22, 2015, his trial was "stopped" and the charges were "dropped." The next day on September 23, 2015, he was walking in to work at the Hitching Post and saw Ms.

Barna and "another person" drive by in a light blue SUV. He said that Ms. Barna "gave me the sign of the finger and with a gun like that." The Defendant said this caused him fear because he knew Ms. Barna to be a "good shot," and he knew she still possessed some of his guns. The Defendant took a few days "trying to figure out what [he] had left" and then filed the petition seeking an order of protection. The Defendant identified his petition for an order of protection signed October 1, 2015, and setting a court date for October 7, 2015. Because the paperwork was not served on Ms. Barna, the court date was moved to October 28, 2015.

The Defendant testified that, at the order of protection hearing, his petition was dismissed, and he was thereafter arrested on the current charges. The Defendant stated that he made an error in the date at the order of protection hearing when he asserted that the incident at the Hitching Post Store occurred on October 1, 2015, but that he corrected himself and testified truthfully that the date was September 23, 2015. He explained that he was mistaken when he alleged October 1, 2015 and that he did so because he wrote down and testified to the date the paperwork was filed rather than the date of the event. He said he was "confused of the date."

Claudia Baker[1] testified that she owned the Hitching Post General Store and the Big South Fork Lodge. She did not recall the exact date but recalled one morning at around 7:40 a.m., she was walking out the front door of the store and noticed a light blue SUV driving slowly by and the occupant making gestures. She identified one of the gestures as "the finger" but could not identify the other "signals." She did not recognize the person in the vehicle.

Based upon this evidence, the jury convicted the Defendant of the lesser-included offense of perjury.

## II. Analysis

On appeal, the Defendant argues that the evidence is insufficient to support his convictions. He argues that the jury "ignored or disregarded the trial court's instructions as to a defense to aggravated perjury" in returning the guilty verdict. The State responds that evidence supports the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the

---

[1] The transcript from the order of protection hearing identifies this witness as Claudia Baker. The trial transcript identifies her as Claudia Barker. For the sake of consistency, we refer to her as Claudia Baker.

State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and

- 8 -

legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

One commits the offense of aggravated perjury if, with intent to deceive, the person: (1) commits perjury as defined in Tennessee Code Annotated section 39-16-702; (2) the false statement is made during or in connection with an official proceeding; and (3) the false statement is material. T.C.A. § 39-16-703(a) (2014). As relevant here, a conviction for the offense of perjury merely requires proof that an accused made a false statement, under oath, with intent to deceive. T.C.A. § 39-16-702(a)(1) (2014).

The evidence, viewed in the light most favorable to the State, shows that the Defendant filed a petition seeking an order of protection against Ms. Barna. In the sworn petition, the Defendant indicated that on October 1, 2015, he saw Ms. Barna in a light blue SUV make threatening gestures toward him. At the hearing, the Defendant testified to the same. Ms. Barna testified that she no longer owned a light blue Lexus SUV by September 2015, and that she drove to Nashville on September 23, 2015 and then flew to Michigan on September 28, 2015. She remained in Michigan until October 16, 2015. She provided documentation verifying her flight and presence in Michigan. This evidence is sufficient to support a jury's finding that the Defendant's testimony, under oath, was false and that he intended to deceive the court in so doing.

The Defendant complains that the jury "ignored or disregarded" the following jury instruction the trial court issued:

> It is not a defense to prosecution for aggravated perjury that the defendant mistakenly believed the statement to be immaterial, but it is a defense if the defendant retracted the statement before completion of the testimony at the official proceeding during which the aggravated perjury was committed.

The trial court also instructed the jury as to the elements of aggravated perjury, the charged offense, and the lesser-included offense of perjury. The jury convicted the Defendant of the lesser-included offense of perjury. The instruction given above applies only to aggravated perjury and not perjury. Further, as discussed above, all inferences to be drawn from the evidence and questions of credibility are within the jury's province. By its verdict, the jury rejected the Defendant's testimony and credited Ms. Barna's

testimony. We will not disturb the jury's findings. The Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE